IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEONARD LEROY VERGITH | ) |
| Plaintiff, | ) Civil Action No. 13-286E |
| v. | ) Judge Cohill |
| CAROLYN COLVIN,<br>Acting Commissioner of<br>Social Security | ) |
| Defendant. | ) |

## OPINION

### *I. Introduction*

Pending before this Court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying the claims of Leonard Leroy Vergith ("Plaintiff" or "Claimant") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 401-434 and 1381-1383f (2012). Plaintiff argues that the decision of the Administrative Law Judge ("ALJ") was erroneous and that the Commissioner's decision was not supported by substantial evidence as required by 42 U.S.C. § 405(g) [ECF No. 9 at 3].

To the contrary, Defendant argues that the medical evidence was minimal, and because Plaintiff's impairments did not prevent him from performing a narrow range of light work as indicated by Plaintiff's Residual Functional Capacity ("RFC") [ECF No 11 at 1-2; (R at 18)], the Plaintiff is not disabled under sections 216(i) and 223(D) of the Social Security Act (R. at 23).

Therefore, the ALJ's decision should be affirmed. The parties have filed cross motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

The Court has reviewed the record in its entirety and for the reasons stated below, we will deny the Plaintiff's Motion for Summary Judgment and grant the Defendant's Motion for Summary Judgment.

## *II. Procedural History*

The Plaintiff filed applications for SSI and DIB on September 3 and 8, 2010, respectively (R. at 14) alleging disability since December 9, 2009. Plaintiff states his disability is related to coronary artery disease status post stent placement, degenerative disc disease, right shoulder impairment, and depression (R. at 16). Plaintiff's claims were denied at the initial level of the administrative review process on October 26, 2010 (R. at 14). Plaintiff requested a hearing on November 9, 2010 (R. at 14). ALJ James Pileggi conducted a *de novo* hearing on April 25, 2012 (R. at 14). Present at the hearing was Vocational Expert ("VE"), Karen Krull (R. at 14). On June 1, 2012, the ALJ determined that Plaintiff was not disabled under Section 1614(a)(3)(A) of the Social Security Act (R. at 23). The ALJ stated, "After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act from December 9, 2009, through the date of this decision." (R. at 14).

On July 25, 2012 Plaintiff filed a timely written request for review by the Appeals Council (R. at 10), which was denied on July 10, 2013 (R. at 1-5), making the ALJ's decision the final decision of the Acting Commissioner. An appeal was subsequently filed by Plaintiff who seeks review of the ALJ's decision.

### *III. Medical History*

On November 5, 2004 Plaintiff had an MRI of the lumbar spine. Sagittal T1 and T2 and axial T2 and proton density imaging angled to the L3-4 through L5-S1 discs was performed. Dr. Charles A. Young found disc herniation at the L3-4 and L5-S1 levels (R. at 376).

On November 23, 2009 Plaintiff attended an appointment with John C. Heflin, M.D., his primary care physician, for a follow up on chronic low back pain. Plaintiff reported good control of back pain with MS-Contin 60am/30pm. He was able to do activities of daily living and moderate duty (R. at 277). Exacerbating factors to his pain were lifting, bending, twisting, pushing and pulling (R. at 277). Plaintiff also developed right rotator cuff pain with impingement (R. at 277). His diagnoses were reported as herniated nucleus pulposus and rotator cuff syndrome (R. at 277). Plaintiff was to continue on current medications and use ice three times daily and gentle range of motion exercises with pendulum for his rotator cuff issue. Dr. Heflin discussed with Plaintiff possible physical therapy and steroid injection for his rotator cuff pain (R. at 277).

On December 9, 2009 Plaintiff presented to Meadville Medical Center with chest pain. The Medical Center took a portable chest x-ray with no significant findings (R. at 257). However, he was found to have unstable angina and acute myocardial infarction with elevated markers and no ST elevation. He was transferred to Hamot Medical Center with symptoms of crescendo angina (R. at 255). Plaintiff was admitted to Hamot Medical Center for a Non-ST-elevation myocardial infarction requiring pacemaker placement. He went directly to the cardiac catheterization laboratory where he was found to have modest disease of his left system but a severe proximal RCA stenosis. This was ballooned and stented with a single bare-metal stent with excellent angiographic results. The following day Plaintiff had persistent bradycardia with symptoms. He

underwent temporary pacemaker placement with subsequent placement of a permanent dual-chamber pacemaker on December 11, 2009. On that same day an x-ray was taken of Plaintiff's chest to reveal the pacemaker was in place and working properly (R. at 245). He was discharged from the hospital on December 12, 2009 and counselled on the importance of diet, exercise and smoking cessation (R. at 220). The Hamot Medical Center notes also document his chronic back pain (R. at 224).

March 22, 2010 Plaintiff attended a follow up appointment with his primary care physician, Dr. Heflin. Plaintiff had not yet completed follow-up labs nor had he been referred to cardiac rehab. He was still smoking and not making a significant effort to quit. He did not have a regular exercise program but denied any chest pain, angina, palpitations, shortness of breath, dyspnea on exertion, or edema (R. at 273). Doctor Heflin arranged a stress test and cardiac rehabilitation. He recommended to Plaintiff that he quit tobacco and requested a follow up in 2 months (R. at 273).

On March 29, 2010 Plaintiff underwent a cardiac stress test. He had a normal sinus rhythm at 77 beats per minute. There was poor R wave progression across the precordium. Plaintiff was able to complete 3 minutes and 12 seconds of exercise. He achieved 55% heart rate of the age predicted maximum. The test was terminated for fatigue and dyspnea. There were no significant ST abnormalities during exertion. Plaintiff was referred for cardiac rehabilitation (R. at 284).

On June 22, 2010 Plaintiff attended an appointment with Dr. Heflin. It was a follow up appointment for low back pain and coronary artery disease. He reported good control of stable low back pain with MS-Contin 60am/30pm and was able to do activities of daily living and light duty (R. at 269). He reported occasional sharp shooting pains to bilateral calves when bending forward and twisting (R. at 269). His pain was exacerbated by lifting, bending, twisting, pushing

4

and pulling (R. at 265). Plaintiff completed cardiac rehab with some exercises limited by his back pain (R. at 265). Plaintiff had a diagnosis of coronary artery disease and herniated nucleus pulposus – lumbar (R. at 269). Plaintiff was told he needed to stop smoking and to continue on his current plan with a follow up in 3 months (R. at 269).

On July 1, 2010 Plaintiff underwent a cardiac stress test post myocardial infarction and status post cardiac rehab. Plaintiff was exercised according to standard Bruce protocol. Test was terminated secondary to leg discomfort and dyspnea. Plaintiff proved to have fairly good exercise capacity with no EKG evidence of ischemia (R. at 283).

On September 22, 2010 Plaintiff attended an appointment with Dr. Heflin. At the appointment he reported "ok" control of chronic low back pain with MS-Contin 60am/30pm and he was able to do activities of daily living and sedentary duty (R. at 265). This was a change from the light duty prescribed on June 22nd. Plaintiff had a diagnosis of coronary artery disease and herniated nucleus pulposus – lumbar (R. at 265). Plaintiff was told he needed to stop smoking and to continue on his current plan with a follow up in 3 months (R. at 265).

December 17, 2010 Plaintiff saw Dr. Heflin for chronic low back pain, GERD, lipids, and coronary artery disease. Plaintiff reported good control of pain and was able to do activities of daily living and sedentary duty (R. at 371). Plaintiff was told to continue his current treatment (R. at 371).

On March 22, 2011 Plaintiff saw Dr. Heflin for coronary artery disease, chronic low back pain, and to discuss shoulder pain and recent kidney stones. Plaintiff's back pain was reported to be controlled with medicine. However, he reported his shoulder pain as worse when he rolls onto his side at night, when he tries to raise arm above shoulder height, or upon internal rotation. Plaintiff had a reduced range of motion due to pain (R. at 366). The doctor diagnosed coronary

artery disease, herniated nucleus pulposus, shoulder pain, and kidney stones. Plaintiff's pain and blood pressure was reported stable. The doctor prescribed ice and heat for Plaintiff's shoulder and gentle range of motion exercises. Doctor Heflin noted that Plaintiff was to begin therapy with SAIDs (feldene) and discussed possible physical therapy, steroid injection, and MRI to evaluate for a tear. Plaintiff was to report his progress to the doctor's office in two weeks (R. at 366-67).

On March 29, 2011 Plaintiff had an x-ray performed on his right shoulder which revealed mild degenerative changes in his right acromioclavicular joint (R. at 344). On the same day an x-ray was performed on the left shoulder with normal results (R. at 345).

On June 17, 2011 Plaintiff saw Dr. Heflin for chronic low back pain and shoulder pain in left shoulder now worse than right. However, Plaintiff reported that his pain was controlled with medications. Dr. Heflin reported that Plaintiff can do activities of daily living and sedentary duty (R. at 363). His diagnosis was herniated nucleus pulposus and rotator cuff syndrome and he reported Plaintiff as is stable on treatment. Plaintiff should avoid NSAIDS with his coronary artery disease and Dr. Heflin referred him to Orthopedist for further evaluation and treatment (R.at 363).

On September 16, 2011 Plaintiff returned to Dr. Heflin for follow up. Added to Plaintiff's usual complaints were gastro esophageal reflux disease and difficulties with mood. As a result of mood difficulties he was not taking his medications as prescribed (R. at 359). Plaintiff has a history of depression since 2005. He was treated with Zoloft 50 with a good response and was successfully weaned from the medication in 2006. Over the past couple of months he had recurrent difficulty with depressed mood, mood irritability, fatigue, and anhedonia. Plaintiff wanted to resume taking Zoloft (R. at 359). Plaintiff's GERD and back pain were controlled

with medications (R. at 359). Plaintiff has not yet seen orthopedics for rotator cuff (R.at 359). Plaintiff's diagnosis: Coronary artery disease, GERD, and depression acute (R. at 359). Doctor Heflin encouraged better compliance with medications and to quit smoking. The Doctor reported Plaintiff was clinically doing well. Plaintiff was to resume Zoloft and if not improving in 2 weeks to call office (R. at 359).

On December 14, 2011 Plaintiff returned to Dr. Heflin for chronic low back pain, rotator cuff difficulties, and lipids. Plaintiff was still smoking. Plaintiff reported "OK" control of chronic low back pain (HNP L3-4, L5-S1) with MS-Contin 60am/30pm. Plaintiff was able to do activities of daily living and sedentary duty (R. at 357). Plaintiff reported episodes where his legs went numb causing him to fall. Plaintiff had 6-9 months of shoulder pain and was treated with a cortisone injection on his right side. Plaintiff was also prescribed home exercises for his rotator cuff. Plaintiff continued to suffer from a reduced range of motion due to pain (R. at 357). His diagnosis: Herniated nucleus pulposus, rotator cuff syndrome, and hyperlipidemia. The doctor planned to add Iodine for pain control of herniated discs, he recommended follow up with orthopedics for rotator cuff and wanted patient to continue with Zocor and to stop smoking (R. at 357).

On December 29, 2011 Plaintiff visited Meadville Medical Center presenting with a complaint of chest pain. Upon evaluation Plaintiff's symptoms were gone and vital signs were normal. His portable chest x-ray was normal (R. at 340). Plaintiff was discharged with the clinical impressions noted: Chest pain and chest pain of GI origin (R. at 339). Plaintiff was told to follow up with his primary care physician (R. at 339).

*Summary of Testimony*

Claimant's past work history dates from 1994 through 2009 at various organizations and companies (R. at 164-68). Most recently, Plaintiff worked as a moulder from 1990-2004, a shear operator (2004-2006), and a grocer meat department wrapper (2006-2009) (R. at 174, 180). Plaintiff reported that he takes the following medications: Aspirin 325 mg, famotidine 40mg, metoprolol 25 mg, morphine sul 30 mg tab, morphine sul 60 mg tab, plavic 75 mg, and simvastatin 80mg (R. at 176, 202). Plaintiff alleges the following conditions: Back injury causing 3 herniated discs in his lower back, right shoulder arthritis, legs ache from knees down through feet, heart attack stint and pace maker, and depression (R. at 173). Plaintiff has been treated for his claimed conditions by Dr. John Heflin, Hamot Heart Institute, and Meadville Medical Center (R. at 176-77).

Plaintiff describes his daily routine as, "7am go to bathroom. 7:30 get food and meds. 8am watch TV in bed. 10am start dozing till noon. Get food. Take heart meds. 12:30 I feed dogs, water dogs, walk to mailbox. 1:00pm watch more TV till 5:30. Then my Uncle gets home. I talk to him for a little [sic] while. 6:00 get dinner. 6:30 take [sic] a shower. 7:00 take med [and] watch T.V. till 9:00 or ten. Go to bed." (R. at 180). Plaintiff states that his conditions affect his sleep because he wakes at night with "cold sweats" and he feels drowsy all the time and sleeps most of the day (R. at 190). He states he has no problem with personal care (R. at 190), though at times it is difficult to pull a shirt over his head or put his shoes and socks on (R. at 203). He is able to make his own meals such as sandwiches, frozen dinners, oatmeal and eggs (R. at 191). He is also able to perform household chores such as laundry, sweeping the floor, dusting and putting dishes in the dishwasher (R. at 191). Plaintiff reports he cannot do yard work (R. at 192). Plaintiff goes to the store once a week either as a passenger in a car or on public transportation

(R. at 192). He claims he cannot drive anymore due to the drowsiness caused by his medication (R. at 204).

Plaintiff lists his limitations as follows: He is only able to lift 30 pounds. He can't bend over longer than a few minutes. He only has short-term memory. He can't stand more than 30 minutes or his legs go numb at times. When he is reaching he loses his balance. After walking for 5 minutes he needs to rest. His eyes become blurry after walking 2 flights of stairs (R. at 194).

A Physical Residual Functional Capacity ("RFC") Assessment was completed by Paul Reardon, M.D. on Plaintiff on October 15, 2010. It notes his primary diagnosis as coronary artery disease and a secondary diagnosis of brady cardia requiring pacemaker. Other alleged impairments are: History of herniated lumbar disc, history of right rotator cuff syndrome, and tobacco dependence (R. at 285). The report indicates that Plaintiff is able to lift 10 pounds, stand or walk for 6 hours in an 8-hour work day, and he is limited in his ability to push or pull in his lower extremities (R. at 286). Plaintiff can occasionally climb, ramp, stairs, ladder, rope or scaffolds, balance, stoop, kneel, crouch, or crawl (R. at 287). Plaintiff should avoid environmental exposure to extreme cold and heat, wetness, humidity, fumes, and hazards (R. at 288). The Plaintiff described daily activities that are significantly limited. Dr. Reardon found the claimant's statements partially credible (R. at 292). Dr. Reardon noted that over time that Dr. Heflin over time reduced Plaintiff's capacity to work from moderate duty work to light duty work to sedentary duty work (R. at 292-93).

Under the Psychiatric Review Technique no medically determinable impairment was found (R. at 294). This report was signed by Roger Gover, Ph.D. on October 18, 2010.

On October 15, 2010 Carl Bancoff, M.D. performed a medical consultant review of the Physical RFC and agreed with all the determinations made by Dr. Reardon (R. at 315).

On November 30, 2010 Plaintiff underwent a psychological evaluation. Plaintiff presented with depression, heart problems, herniated discs, and a history of learning difficulties (R. at 318). A battery of tests were performed on Plaintiff at this time. Plaintiff reported having constant moderate symptoms of depression, including fatigue and apathy as well as isolation (R.at 319). He has suicidal ideation at times (R at 319). He reported severe anxiety which occurs at times with tremors and perspiration (R. at 319). "The client has experienced auditory hallucinations involving 'weird' noises, and he also indicates having confusion and poor comprehension. Mood swings result in a feeling of helplessness, but he says he is most commonly in a stable mood." (R. at 319). Plaintiff exhibits symptoms of Attention Disorder Hyperactivity Disorder ("ADHD") (R. at 319-320). Plaintiff's prognosis was deemed fair in terms of higher level functioning and personality integration (R. at 321). Plaintiff's overall personality adjustment is considered poor (R. at 322). He was determined to have functional limitations in the following: Below average spelling abilities, difficulties with calculation, higher level language-based abstraction, comprehension of social norms, coping skills, overwhelming depression and anxiety, no history of mental supports, limited physical mobility, and repeated job firings (R. at 322). His diagnosis was major depressive disorder, recurrent, generalized anxiety disorder, learning disorder, polysubstance dependence (in remission), back, arthritis, stomach, heart attack, pacemaker, and a GAF=5.[1] (R. at 323). Martin Meyer, Ph.D. and Julie Uran, Ph.D.

---

[1] The GAF scale, devised by the American Psychiatric Association, ranges from zero to one hundred and is used by a clinician to indicate an overall judgment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-R). The greater the number the higher the functioning of the individual.

recommended mental health supports, psychiatric referral, avoidance of physically strenuous activities, and SSI referral (R.at 323).

Cheri Lewis, MSW of the Arbor Action Review Group prepared a vocational report on December 8, 2010. The report details the Plaintiff's work and medical history and concludes that due to his limited education (9th grade), and his work history as an unskilled laborer, his vocational adaptability and occupational base are markedly impaired (R. at 329). "The Social Security file documentation provides sufficient evidence to confirm severe long-standing medical impairments. Mr. Leonard Vergith's overall condition significantly restricts him from performing activities of daily living, and work related activities up to expected daily standards." (R. at 329) "His physical limitations prevent him from doing his past work and his limited education and closely approaching advanced age negate his ability to make a vocational adjustment or acquire new skills typical of light-duty and sedentary jobs." (R. at 329). Ms. Lewis concludes, "Mr. Vergith is clearly unfit for his past work as a Meat Wrapper, and is unable to perform any other substantial gainful activity." (R. at 330).

## *IV. Standard of Review*

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits. See 42 U.S.C. § 405(g)(2012). This Court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. See id. "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). This standard, however, does not permit the court to

substitute its own conclusions for that of the fact-finder. See id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. 5 U.S.C. § 706(1)(F) (2012).

*V. Discussion*

Under SSA, the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ..." 42 U.S.C. §§ 416(i)(1); 423(d)(1)(A); 20 C.F.R. § 404.1505 (2012). A person is unable to engage in substantial activity when:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled under SSA, a five-step sequential evaluation process must be applied. See 20 C.F.R. § 404.1520; McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). The evaluation process proceeds as follows: At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity for the relevant time periods; if not, the process proceeds to step two. See 20 C.F.R. § 404.1520(a)(4)(i). At step two, the Commissioner must determine whether the claimant has a severe impairment. See id. at § 404.1520(a)(4)(ii). If the Commissioner determines that the

claimant has a severe impairment, he must then determine whether that impairment meets or equals the criteria of an impairment listed in 20 C.F.R., part 404, subpart p, Appx. 1. § 404.1520(a)(4)(iii). If the claimant does not have an impairment which meets or equals the criteria, at step four the Commissioner must determine whether the claimant's impairment or impairments prevent his from performing his past relevant work. See id. at § 404.1520(a)(4)(iv). If so, the Commissioner must determine, at step five, whether the claimant can perform other work which exists in the national economy, considering his residual functional capacity and age, education and work experience. See id. at § 404.1520(a)(4)(v); see also McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

In this case, The ALJ determined that the claimant has the following severe impairments: coronary artery disease status post stent placement, degenerative disc disease, right shoulder impairment, and depression (R. at 16). Nevertheless, he determined that the Claimant does not have an impairment or a combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 4040, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d0, 404.1526, 416.920(d), 416.925, and 416.926) (R. at 16). The ALJ, in his report, finds neither Plaintiff's back and heart conditions, nor his depression meet the requirements of the criteria listing (R. at 17) to qualify as a disability. In addition, the Plaintiff has no restrictions on activities of daily living and no problems with personal care (R. at 17). The ALJ found the functional limitations listed by Cheri Lewis, MSW of the Arbor Action Review Group to be overstated as compared to Plaintiff's physical examinations and Plaintiff's own self-report (R. at 17-18).

The ALJ also determined the Claimant's statements are not credible (R. at 19).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to

> cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limited effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. (R. at 19).

Moreover, the ALJ is not required to uncritically accept Plaintiff's complaints. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d Cir. 2011). The ALJ, as fact finder, has the sole responsibility to weight a claimant's complaints about his symptoms against the record as a whole. See 20 C.F.R. §§ 404.1529(a), 416.929(a).

The Commissioner, moving forward, used the sequential evaluation process and determined at step (4) that the Plaintiff is not able to participate in past work because the VE testified that Plaintiff's past work was performed at the medium or heavy exertional level (R. at 21-22) and at step (5) that the Plaintiff has not met his burden of proof that he cannot work in some capacity in the national economy. The Commissioner relied on the ALJ's determination that despite the Plaintiff's impairments, Plaintiff retained the capacity to perform light work (R. at 18).

The ALJ did not find that Plaintiff could perform a full range of light work. He found that Plaintiff's abilities were eroded by additional limitations. To determine the extent to which the Plaintiff's limitations erode the unskilled light occupational base, the ALJ asked the VE whether jobs exist in the national economy for a person of like qualities to the Plaintiff. The VE found that the Plaintiff could perform the requirements of representative occupations such as fast food worker (2 million jobs nationally), ticket taker (106,000 jobs nationally), and host (75,000 jobs nationally) (R. at 22). The VE's testimony squarely contradicted the functional limitations listed by Cheri Lewis, MSW of the Arbor Action Review Group.

"Based on the testimony of the vocational expert, the [ALJ] concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is

14

capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. at 23). The ALJ concluded that despite the limitations caused by his impairments, Plaintiff retained the capacity for simple, routine, light work that did not require overhead repetitive reaching, or pulling with his upper extremities; putting stress on his arms or shoulders; or balancing (R. at 18). The ALJ "reviewed all the evidence of record, including the state agency physicians' assessment, and decided to give it great weight because it was consistent with the objective medical evidence and Plaintiff's treatment history." [ECF No. 11 at 13].

In support of his motion for summary judgment, Plaintiff argues that the ALJ's decision relies on portions of a non-examining medical consultant's findings that were derived from an incomplete record which does not meet the "substantial evidence test." [ECF No. 9 at 10]. The Plaintiff states that the October 15, 2010 RFC was completed greater than a year prior to the hearing on April 25, 2012 and did not include a review of Dr. Heflin's medical records after September 22, 2010 [ECF No. 9 at 10-11]. The medical evidence of record shows that Plaintiff's condition has deteriorated since that time [ECF No. 9 at 11].

The Commissioner responded to the Plaintiff's claims in her Brief in Support of Motion for Summary Judgment [ECF No. 11]. In her brief the Commissioner covers the medical records which occurred after the hearing and RFC and states the medical records subsequent to the RFC were considered by the ALJ. Furthermore, the Commissioner noted that Dr. Heflin's notes subsequent to September 2010 were "the same" and the examinations were normal [ECF No. 11 at 6]. The Commissioner's regulations "impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356,

361 (3d Cir. 2011). It is for the ALJ to determine whether the subsequent medical evidence impacts the persuasiveness of an opinion. See id. (citing Social Security Ruling (SSR) 96-6p).

If a treating source opinion is not given controlling weight, the ALJ will consider the following factors in determining the appropriate weight to afford the opinion: (1) the examining relationship; (2) the length, nature, and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) any medical specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c). Dr. Heflin was a treating source, but his opinions were not entitled to controlling weight because his appointment notes were generally unchanged and essentially normal and yet he downgraded Plaintiff's capacity to do work from moderate to light to sedentary without any medical evidence to justify the downgrade [ECF No. 11 at 14].

We acknowledge that generally more weight is to be given to the opinions of an examining source than to the opinions of non-examining sources, and even more weight is generally given to the opinions of the treating source. See 20 C.F.R § 416.927(c)(1) and (2). However, the Third Circuit precedent provides that the ALJ must analyze all relevant, probative evidence and provide adequate explanation for disregarding evidence. See Fargnoli v. Massanari, 247 F.3d 34 (3d Cir. 2001); Burnett v. Commissioner, 220 F.3d 112, 121-22 (3d Cir. 2000); Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Cotter v. Harris, 642 F.2d 700 (3d Cir. 1981). When the medical evidence of record conflicts, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Plummer v. Apfel, 186 F. 3d 422, 429 (3d Cir. 1999). The ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, and not on the basis of the Commissioner's own judgment or speculation, although he may afford a treating physician's opinion more or less

weight depending upon the extent to which supporting explanations are provided. See Plummer, 186 F.3d at 429. In this case, we find that the Commissioner has adequately explained her reasons for assigning less weight to Dr. Heflin's reports.

In addressing Plaintiff's argument that Drs. Meyer and Uran found Plaintiff to have a GAF score of 50, which is tantamount to a finding of disabled. We again, defer to the ALJ's review of the record as a whole and find that a GAF of 50 alone is not convincing of a determination of disability in light of other evidence. We agree that Dr. Heflin, as treating physician, provided a wealth of information regarding Plaintiff's conditions. However, we find his determination that Plaintiff is only fit for sedentary work is unsupported by his notes and the record as a whole. While, the Plaintiff has several medical conditions, including heart problems, back and shoulder problems, and depression, we find the record reflects that his conditions are well-controlled with treatment and medication and that he maintains a residual capacity to work despite his ailments. We find that the ALJ provided substantial evidence for his determination that Plaintiff could perform simple, routine, light work taking into account his various impairments. Therefore, it is our opinion the ALJ's determination is supported by substantial evidence of record.

*VI. Conclusion*

For the foregoing reasons, we conclude that there is substantial evidence existing in the record to support the Commissioner's decision that Plaintiff is not disabled, and therefore, the Defendant's Motion for Summary Judgment will be granted. The Plaintiff's Motion for Summary Judgment will be denied. An appropriate order will be entered.

Date: August 27, 2014

Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc: counsel of record